Statement.
MONROE, J.
Relator complains that he was prosecuted under section 2 of Act No. 63, p. 103, of 1877, Extra Session, in the district court for the parish of Plaquemines, by an information charging that, not being a duly licensed, appointed, and qualified branch pilot for the port of New Orleans, he had piloted a certain foreign vessel from the Gulf of Mexico through the South Pass of the Mississippi river; and that, by way of demurrer, motion to quash, and motion in arrest of judgment, he set up the following-defense, to wit: That, under article 1 of the Constitution of the United States, Congress has power to regulate commerce with foreign nations and among the several states; that, in the exercise of that power, Congress enacted the law approved March 2,1837 (chapter 22, 5 Stat. 153), which provides that it shall be lawful for the master of any vessel, coming into, or going out of, any port situate upon waters which are the boundary between two states, to employ a pilot, duly licensed or authorized by the laws of either of the states bounded by such waters, to pilot such vessel, to or from such port, any law, usage, or custom, to the contrary, notwithstanding; that, under laws of the state of Mississippi, which is bounded by waters upon which the port of New Orleans is situated,'the board of harbor commissioners of the port of Natchez is authorized to issue licenses permitting persons to act as pilots upon the waters of Natchez Harbor and of all passes leading thereto and leading to and from the sea; that, at the date laid in the information against him, and now, relator held, and holds, such license, and was, and is, entitled to all the rights thereby conferred; and that any statute of the state of Louisiana which pretends to confer upon the officers of the state power to prosecute persons acting as pilots, who have been authorized so to act by such states as are described in the act of Congress aforementioned, is, to that extent, void, as repugnant to said act, and that said court is without right or jurisdiction to enforce such statute. The demurrer (which sets up that the information. is defective, in failing to charge that relator, when acting as pilot, was not licensed by the laws- of Mississippi), the motion to quash, and the motion in arrest, having been overruled, and relator *525 having been found guilty, as charged, and having no right of appeal, he has made this application (invoking the supervisory jurisdiction of this court) for writs of certiorari .and prohibition.
Opinion.
It is well settled that the states, upon entering the Union (including not only the .original members, but those which have entered since), retained ownership of, and sovereignty over, the lands lying under the navigable waters within their respective limits, and it was at one time supposed (by some persons) that the same rights were retained with respect to the waters. The Supreme Court of the United States, however, held, as soon as the question was presented to it, that the power to regulate commerce, which is conferred by the Constitution on 'Congress, “is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed by the Constitution,” and, that to the extent necessary for such full and complete exercise, it includes jurisdiction over the avenues and vehicles of commerce, and hence extends to the navigable waters of the country, irrespective of state lines. Apart from .the limitations so established and recognized, .the waters lying within the limits of a state are as much subject to its exclusive dominion as the land. It is therefore as inconceivable that one state should undertake to regulate the use of the waterways of another as that it should assume to regulate the highways by land, and it is equally inconceivable that Congress should assume to vest in one ¡state, with respect to another, a power, which though possessing, it has never itself, seen iit to exercise. The first Congress enacted a law (Act Aug. 7, 1789, c. 9, 1 Stat. 58) -declaring:
“That all pilots in the bars, inlets, rivers, 'harbors and ports of the United States shall continue to be regulated in conformity with existing laws of the states, respectively, wherein such pilots may be, or with such laws as the states may, respectively, hereafter, adopt for the purpose, until further legislative provision shall be made by Congress.”
Referring to this law, Marshall, C. J., in a case to which we have already alluded, said:
“When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every state. The act which has been mentioned adopts this system and gives it the same validity as if its provisions had been specially made by Congress.” Gibbons v. Ogden, 9 Wheat. (U. S.) 1, 6 L. Ed. 23.
And, again, it has been said:
“The act • of 1789 contains a clear and authoritative declaration by the first Congress that the nature of this subject is such that, until Congress should find it necessary to exert its power, it should be left to the legislation of the states; that it is local and not national; and that it is likely to be the best provided for, not by one system or plan of regulations, but by many, as the legislative discretion of the states should deem applicable to the local peculiarities of the ports within their limits.” Cooley v. Board of Wardens of Port of Philadelphia, 12 How. (U. S.) 319, 13 L. Ed. 996.
In the course of a few years, however, it was found that troubles were arising from, and the interests of commerce were being prejudicially affected by, conflicting claims to jurisdiction, asserted by states over navigable waters constituting the boundaries between them. Thus, New York Harbor and Hudson river lie between the states of New York and New Jersey, Delaware Bay and the Delaware river lie between New Jersey and Delaware, the Delaware river lies between New Jersey and Pennsylvania; and those states were each asserting the right to regulate pilotage on the waters common to both, .and, at times, denying that right to the other. Congress, accordingly, not from any desire to exercise, or to delegate, its authority, but from necessity, interposed and enacted a law (Act March 2, 1837) which reads:
“That it shall be, and may be, lawful for the master or commander of any vessel coming into or going out of any port situate upon waters *527 which are the boundary between two states, to employ any pilbt, duly licensed or authorized by the laws of either of the states bounded on the waters, to pilot said vessel to or from said port; any law, usage, or custom, to the contrary, notwithstanding.”
The specific charge against relator is that he, “not being a duly licensed, appointed, and qualified branch pilot of the port of New Orleans, state of Louisiana, and having no right or authority to pilot any vessel inward or outward bound to or from the port of New Orleans or through the duly-established pilotage grounds at the mouth of the Mississippi as established by the laws of the state, did, knowingly, go on board a certain foreign steam vessel, called the Evona, while the said vessel was bound from the Gulf of Mexico to the city of New Orleans, on, over and through said pilotage grounds so established at the mouth of the Mississippi river, and on and through the South Pass, at the mouth of said river, and did, willfully and wrongfully, and without a branch pilot’s license, so 'do, as aforesaid, pilot said vessel in from the Gulf of Mexico through such pass to the head of the passes of aforesaid river, contrary to the form of the statutes of the state of Louisiana,” etc.
The statute under which the charge is made is Act No. 63 of 1877, Extra Session, § 2, which reads:
“That whoever shall be guilty of acting or attempting to act as pilot to any vessel, inward or outward bound to and from the port of New Orleans, who is not, a duly licensed branch pilot, shall suffer fine not exceeding $100, or imprisonment, not exceeding two months, or both, at the discretion of the court.”
It is clear that the information charges an offense within the meaning of the statute, and we think it equally clear that the matter is in no wise affected by the act of Congress of 1837, above quoted. Since, whilst that act provides that either of two states having a water boundary “between” them may license persons to pilot vessels to and from “any port situate” thereon, i. e., on the “waters which are the boundary between (the) two states,” the waters of the Mississippi river, at South Pass, thence to New Orleans, and thence to the Mississippi state line, lie wholly within the state of Louisiana, and are no more the boundary “between” Louisiana and Mississippi than between Louisiana and any other state which the Mississippi river, or any of its tributaries, may pass through, or touch, on their way to the Gulf of Mexico.
This we understand to have been the construction placed upon the law in the case of The Glenearne (D. C.) 7 Eed. 604, in which it was held that a pilot, licensed under the law of Washington Territory to operate on the Columbia river (lying between that territory and Oregon), had no right to pilot a vessel through the Willamette river (a tributary of the Columbia, lying wholly within the state of Oregon), a distance of 12 miles, to Portland, Or. It is true that, in the case of The Clymene (D. C.) 9 Eed. 164, and (C. C.) 12 Eed. 346, it was held that a Delaware pilot was authorized to pilot a vessel through Delaware Bay and river, to Philadelphia: but, in comparing that case with this, it will be noted that the Delaware pilot boarded, in waters constituting the boundary between Delaware and New Jersey, a vessel, bound (through those waters and through waters constituting the boundary between Pennsylvania and New Jersey) upon an interstate voyage, whereas, in the instant case, the relator boarded, in Louisiana waters, a vessel bound, through Louisiana waters, to a Louisiana port. Again, the case of The Clymene was a suit for compensation for services rendered; whereas the case before ns is a prosecution by the state of Louisiana for an alleged violation of a state law. And, still again, we venture to think that a broader interpretation has been placed upon the act of 1837, in the Clymene Case than is warranted by the act, or by the attitude of the general government, since its organiza *529 tlon, or by the jurisprudence of the Supreme Court of the United States in relation to the subject-matter. In 1852, Congress passed a law (Aug. 30, 1852, e. 106, 10 Stat. 61) containing various provisions in regard to fire, pumps, boats, life preservers, the carriage and storage of dangerous articles, etc., and also providing for the appointment of two inspectors, one of whom was to possess a practical knowledge of shipbuilding and the uses of steam, in navigation, and the other to possess knowledge of, and experience in, the duties of an engineer of steam vessels and of the construction and use of boilers and machinery and appurtenances connected with them; and the two were required to make an examination of the hulls of vessels, to Inspect and test the boilers and machinery, and to require licenses to be obtained before dangerous articles could be taken aboard. There were also some provisions in the act relating to pilots, and it was contended (in the ease from the report of which we obtain the foregoing information) that the act conflicted with, and controlled, the pilotage law enacted by the state of California in 1861. In considering the question, however, the Supreme Court of the United States said:
“The act [referring to the act of Congress] contains few provisions relating to pilots. Indeed, it was not directed to the remedy of any evil of the local pilot system. There were no complaints against the port pilots. On the contrary, they were the subjects of just praise for their skill, energy, and efficiency. * * * The term ‘pilots’ is equally applicable to two classes of persons — to those whose employment is to guide vessels in and out of ports, and to those who are intrusted with the management of the helm and the direction of the vessel on her voyage. To the first class, for the proper performance of their duties, a thorough knowledge of the port in which they are employed is essential, with its channel, currents, and tides, and its bars, shoals, and rocks, and the various fluctuations and changes to which it is subject. To the second class, knowledge of entirely different character is necessary. Yet the act in question does not require the inspectors, who are to license pilots under its provisions to possess any knowledge of the harbors for which, under the theory of the plaintiff in error, pilots are to be licensed, or to exact any such knowledge from the pilots, themselves. ’ * * * The act does not purport to establish regulations for port pilotage, and we cannot suppose that, in a measure intended to give greater security to-life, Congress would have swept away all the safeguards in this respect, provided by state legislation, without substituting anything in their place. Under the act, the ports may be left entirely without resident or local pilots, for-it does not require the appointment of such pilots, though the necessity for them must have-been obvious.” Steamship Co. v. Joliffe, 2 Wall. (U. S.) 459, 17 L. Ed. 805.
The legislation of the state of Louisiana-upon the subject is elaborate in the extreme, and its effect has been the establishment and' maintenance of a system which is most satisfactory in its operation, and of an organized body of men whose worth, capacity, and loyalty is beyond praise. The law provides-that the number of bar pilots for the port of New Orleans shall not be less than 30. A bar (or “branch”) pilot must be a qualified elector of the state; he must have served in a pilot boat, at the mouth of the river, for 12" months next preceding his appointment by the Governor, and he must be recommended for the appointment by a state board of examiners consisting of three branch pilots; he' must give a bond of $2,000, approved by the-master and wardens of the port of New Orleans; he must not absent'himself from, his station for more than seven days without leave, granted by the Governor upon the written recommendation of the board of examiners; he may be suspended or removed by the Governor; he must be owner or part owner of at least one decked pilot boat, of not less than 50 tons burden, which must be-kept employed as a pilot boat; he is liable to suspension, fine, and imprisonment if he refuses or neglects to board a ship when called.
In 1871, Congress passed another act (Act Eeb. 28, 1871, c. 100, 16 Stat. 440), which, in repealing the act of 1852, provided that:
“Nothing in this act shall be construed to annul or affect any regulation, established by *531 the laws of any state, requiring vessels entering •or leaving a port of any such state, other than ■coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such state, or of a state situate upon the waters of such •state.”
In June, 1874, still another act was passed ■(Act June 1, 1874, e. 201, 18 Stat. 50, pt. 3), authorizing the Secretary of War to assume full control “over the particular channel [the :South Pass] at the mouth of the Mississippi river, in the course of excavation or improve.ment by the government of the United States,” so far as might be necessary to the carrying on and the protection of such work, and one Williams, holding a license as pilot from the local inspectors of the port •of New Orleans, and assuming to act under it, having been prosecuted for so doing, under the statute of 1877 which is here called in question, defended, on the ground that the act of Congress of 1874 had deprived the •state of its pilotage jurisdiction quoad the channel, or pass, referred to in that act. 'This court, however, held that the act ha<H no such purpose, or effect, and that there had 'been no legislation by Congress which repealed or superseded the pilotage laws of the state. State ex rel. Williams v. Judge, 36 La. Ann. 122.
We are of opinion that the view thus expressed is entirely applicable to the present situation. In conclusion, we may say that we have examined the law of Mississippi upon which relator relies (Ann. Code Miss. 1892, §§ 2252-2296, as amended by Acts 1896, p. 140, c. 128), and we do not conclude therefrom that it was the intention of the Legislature of that state to authorize the issuance •of licenses to persons to engage in piloting in waters lying wholly outside of the state •of Mississippi and wholly inside the state of Xouisiana, and we doubt very much whether the license as issued to the relator was in-tended to be so used.
It is therefore ordered, adjudged, and decreed that the restraining order herein made be rescinded; that the writ of prohibition prayed for by relator be denied; and that this proceeding be dismissed at relator’s cost.